**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**
**TULSA DIVISION**

| | | |
|---|---|---|
| **(1) FELIX STEGEN** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **CASE NO. 15-CV-582-GKF-PJC** |
| | ) | |
| **(1) VOLKSWAGEN AG,** | ) | |
| **(2) AUDI AG, AND** | ) | |
| **(3) VOLKSWAGEN GROUP OF AMERICA,** | ) | |
| **INC.** | ) | |
| **Defendants.** | | |

## COMPLAINT

**COMES NOW** Plaintiff Felix Stegen ("Plaintiff" or "Mr. Stegen"), through undersigned counsel, and hereby submits this complaint and allegations as follows based on personal knowledge as to himself and on information and belief as to all other matters, against Defendants Volkswagen AG, Audi AG, and Volkswagen Group of America, Inc. (collectively, the "Defendants"):

## I.    BACKGROUND

1.    Plaintiff brings this action against the Defendants for their use of unfair, unlawful, and fraudulent business practices in violation of Oklahoma and federal law.

2.    Since 2009, Defendants have manufactured and marketed certain vehicles containing 2.0 liter diesel engines which, according to the Unites States Environmental Protection Agency ("EPA"), contained a defeat device (the "Affected Vehicles"). Defendants falsely represented to the purchasers of the Affected Vehicles that the vehicles would both attain the excellent fuel economy associated with diesel engines while also being environmentally friendly and compliant with all applicable State and federal environmental laws and regulations.

3.      Defendants' representations proved to be false. On September 18, 2015, the EPA sent Defendants a Notice of Violation ("NOV"), which is now a publicly available document.[1] The NOV states that Defendants "manufactured and installed defeat devices in certain model year 2009 through 2015 diesel light-duty vehicles equipped with 2.0 liter engines." It further stated that "[t]hese defeat devices bypass, defeat, or render inoperative elements of the vehicles' emission control system that exist to comply with [Clean Air Act] emission standards." Thus, while these vehicles will meet emissions standards in testing situations, during "normal vehicle operation" they will emit nitrogen oxides ("NOx") up to 40 times above EPA compliant levels, depending on the type of drive cycle.

4.      On information and belief, NOx contaminations can cause increased rates of asthma and other respiratory problems.

5.      Defendants have admitted to this fraudulent scheme in multiple, recent press released and Defendants have caused all unsold vehicles equipped with the defeat devices to be taken off of the market.  Defendants are in the process of removing said vehicles from dealerships.

6.      Defendants sold approximately 500,000 Affected Vehicles in the United States through this fraudulent scheme. Volkswagen has admitted that the worldwide number of Affected Vehicles sold is close to 11 million.

7.      Due to Defendants' misrepresentations, the value of the Affected Vehicles is greatly diminished, as evidenced by the fact that Defendants have ceased all sales of the Affected Vehicles.  In addition, on information and belief the Plaintiff like other affected consumers has been injured in that the Affected Vehicles violate Federal emissions standards, do not meet

---

[1] *See* EPA Notice of Violation (Sept. 18, 2015), http://www3.epa.gov/otaq/cert/documents/vw-nov-caa-09-18-15.pdf. (Last visited on Sept. 24, 2015).

represented fuel efficiency and performance specifications without violating the law, will require modifications, retrofits and recalls to comply with Federal law emissions standards, and/or because represented product performance characteristics such as torque and fuel economy will be adversely affected by necessary corrective technologies.

## II.   JURISDICTION AND VENUE

8.      Both jurisdiction and venue are proper in this District.  The Defendants conduct or have conducted business activity, as well as distributed Affected Vehicles, throughout the District; and Plaintiff purchased and/or used the Defendants' vehicles in this District.

9.      Jurisdiction is based on complete diversity between the Plaintiff and all of the Defendants pursuant to 28 U.S.C. § 1332.

10.     The amount in controversy exceeds $75,000.00.

## III.   PARTIES

11.     Plaintiff Mr. Stegen is an individual and resident of the state of Oklahoma. Plaintiff currently owns a model year 2015 Jetta TDI (Turbo Direct Injection) diesel, which was purchased in June 2015 at the Don Thornton Volkswagen of Tulsa dealership.  He purchased the vehicle for its alleged environmentally-friendly, clean diesel design, as well as its fuel efficiency. He was never told of the emissions issue currently being litigated.  On information and belief, the car is equipped with one of the 2.0 liter TDI diesel engines in which Defendants placed defeat devices.

12.     Defendant Volkswagen Group of America, Inc. (hereinafter referred to collectively with Defendant Volkswagen AG as "Volkswagen") is a corporation created and existing pursuant to the laws of the state of New Jersey with a principal place of business in the state of Virginia. Volkswagen Group of America, Inc. regularly and systematically conducts

business within the state of Oklahoma through its local dealers. Volkswagen Group of America, Inc. is a wholly-owned subsidiary of Volkswagen AG. Volkswagen Group of America, Inc. also does business as Audi of America, Inc. Volkswagen may be served at its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, VA 20171. Volkswagen and/or its agents designed, manufactured, and installed the 2.0 liter diesel engines in the Affected Vehicles. Volkswagen and/or its agents installed the defeat devices on these vehicles. Volkswagen and/or its agents also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

13.     Defendant Volkswagen AG (hereinafter referred to collectively with Defendant Volkswagen Group of America, Inc. as "Volkswagen") is a corporation created and existing pursuant to the laws of the nation of Germany. Volkswagen AG regularly and systematically conducts business within the state of Oklahoma. Volkswagen AG may be served pursuant to the Hague Convention at Volkswagen AG, Berliner Ring 2, 38436 Wolfsburg, Germany. Volkswagen and/or its agents designed, manufactured, and installed the 2.0 liter diesel engines in the Affected Vehicles. Volkswagen and/or its agents installed the defeat devices on these vehicles. Volkswagen and/or its agents also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

14.     Defendant Audi AG is a corporation created and existing pursuant to the laws of the nation of Germany. Audi AG regularly and systematically conducts business within the state of Oklahoma. Audi AG may be served pursuant to the Hague Convention at Auto-Union-Str. 1 D-85045 Ingolstad, Germany. Audi AG is a related entity to Volkswagen. Along with Volkswagen, Audi AG and/or its agents designed, manufactured, and installed the 2.0 liter diesel

engines in certain of the Affected Vehicles and installed the defeat devices on these vehicles. Audi AG and/or its agents also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

## IV.   FACTUAL ALLEGATIONS

### A.   Defendants Market "Clean Diesel" Vehicles to Oklahoma Consumers

15.   Since 2009, Defendants have marketed the Affected Vehicles to Oklahoma consumers.

16.   The Affected Vehicles include the following models:

- 2009 to 2015 Volkswagen Jetta TDI Clean Diesel;
- 2009 to 2015 Volkswagen Beetle TDI Clean Diesel;
- 2009 to 2015 Volkswagen Golf TDI Clean Diesel;
- 2012 to 2015 Volkswagen Passat TDI Clean Diesel; and,
- 2009 to 2015 Audi A3 TDI Clean Diesel.

Discovery may reveal additional affected models.

17.   Defendants marketed the Affected Vehicles as "Clean Diesel" cars.

18.   Defendants represented that the diesel engines in the Affected Vehicles were environmentally friendly and fuel efficient, while still maintaining a high level of performance. For example, Defendants' advertisements boasted:

This ain't your daddy's diesel. Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel[2]

***

The all-new 2015 Golf TDI combines class-leading fuel economy, more power, advanced technology, reduced emissions, all while offering a tremendous value starting $3,000 less than the outgoing model," said Mark McNabb, Chief Operations Officer, Volkswagen of America. "This Northwest Green Vehicle of the Year honor validates the benefits of the Golf TDI and highlights the

---

[2] VOLKSWAGEN TDI CLEAN DIESEL FEATURES, www.vw.com/features/cleandiesel/section/highlights (Last Visited Sept. 21, 2015.).

leadership position the Pacific Northwest has taken in embracing alternative fuel technologies like TDI® Clean Diesel.[3]

\*\*\*

Volkswagen of America is pleased to announce today that Green Car Reports, a leading online consumer resource for eco-friendly and fuel efficient vehicles, has named the 2015 Volkswagen Golf range as its "Best Car to Buy 2015." ... Volkswagen's Golf TDI® Clean Diesel models achieve an estimated EPA fuel economy rating of30 mpg city and 45 mpg highway when equipped with the six-speed manual transmission and 31/43 mpg with the six-speed DSG® dual-clutch automatic.[4]

\*\*\*

Audi pioneered TDI® (Turbo Direct Injection) engines to deliver morvine torque, lower fuel consumption and reductions in carbon dioxide emissions. Earning its reputation for reliability and power in grueling motorsports endurance competition, TDI has become a major attraction across the Audi vehicle lineup and remains the best-selling clean-diesel option for premium car buyers.[5]

\*\*\*

Audi has now answered with two sportback options, the A3 e-tron PHEV and the newly announced A3 TDI. When these two models reach the market next year Audi will have a compelling green narrative in the versatile sportback packaging.[6]

19.     Defendants charged, and Plaintiff paid, substantial premiums for the "Clean Diesel" vehicle based upon the representation that the vehicle was fuel efficient and environmentally friendly while still maintaining a high performance level.

20.     Defendants charge substantial premiums for the Defeat Device Vehicles. For example, for the 2015 Volkswagen Jetta, the base S model with a gasoline engine has a starting MSRP of $18,780. The base TDI S Clean Diesel, however, has a starting MSRP of $21,640, a price premium of $2,860. The Clean Diesel premium for the highest trim Jetta models with a

---

[3] VOLKSWAGEN MEDIA NEWSROOM -JULY 21, 2015, http://media.vw.com/release/802/ (last visited Sept. 22,2015).

[4] VOLKSWAGEN MEDIA NEWSROOM _Nov. 20, 2014, http://media.vw.com/release/876/ (last visited Sept. 22, 2015).

[5] AUDI TDI CLEAN DIESEL, http://www.audiusa.com/newsroom/topics/2014/tdi-clean-diesel (last visited Sept. 22, 2015).

[6] AUDI PRESS RELEASE-APRIL 14, 2014, http://www.audiusa.com/newsroom/news/press-releases/2014/04/audi-introduces--all-new-audi-a3-tdi-sportback (last visited Sept. 22, 2015).

comparable gasoline engine is substantially higher: The Jetta SE has a starting MSRP of $20,095, while the Clean Diesel TDI SEL MSRP is $26,410, a 31% premium.

21.     These premiums occur across all of the vehicles in which Defendant installed its "defeat device" for emissions testing. The table below sets forth the price premium for each comparable base, mid-level and top-line trim for each affected model:

### Clean Diesel Price Premiums

| Model | Base | Mid-level | Top-line |
|-------|------|-----------|----------|
| VW Jetta | $2,860 | $4,300 | $6,315 |
| VW Beetle | $4,635 | n/a | $2,640 |
| VW Golf | $2,950 | $1,000 | $1,000 |
| VW Passat | $5,755 | $4,750 | $6,855 |
| Audi A3 | $2,805 | $3,095 | $2,925 |

22.     The Affected Vehicles made up a significant portion of Defendants' overall sales. For example, in 2014, Volkswagen's TDI Clean Diesel models accounted for approximately 21 percent of their overall sales in the United States, and, as a result of Defendants' "Clean Diesel" campaign, Volkswagen has become the largest seller of diesel passenger vehicles in the United States.

**B.      *The Relevant Regulatory Framework***

23.     The Clean Air Act[7] ("CAA") and the regulations promulgated there under are designed to reduce emissions of NO x and other pollutants from motor vehicles such as the Affected Vehicles.

24.     Under the CAA, in order to sell passenger vehicles in the United States, a car manufacturer, such as Defendants, must apply for and receive a certificate of conformity ("COC") for the vehicle model it wishes to sell. Without first obtaining a COC, car

---

[7] Codified at 42 U.S.C. §§ 7401-7671q.

manufacturers are barred from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, delivering for introduction into commerce, or importing passenger vehicles in the United States.  Car manufacturers are also barring from causing any of the foregoing acts to take place.

25.     As a result, the CAA required Defendants to receive a COC for each model of the Affected Vehicles prior to their sale to the owner of the Affected Vehicles.

26.     A defeat device is an auxiliary emission control device ("ABCD") that "reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01.

27.     Motor vehicles with defeat devices cannot be granted a certificate of conformity. EPA, *Advisory Circular Number* 24: *Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972).

28.     Moreover, in a COC application, car manufactures must list all ABCD on the vehicle models in question and provide a justification for any ABCD. The COC then applies only to those cars that are as described in the application. For example, the COC issued to Defendants "covers only those new motor vehicles or vehicle engines which conform in all material respects, to the design specifications" as described in Defendants' application.

**C.     *Defendants Install "Defeat Devices" and Deceive State and Federal Regulators and Defraud Consumers, Including Plaintiff***

29.     Upon information and belief, beginning in 2009, Defendants knew that the Affected Vehicles could not achieve the fuel economy and performance levels which Defendants desired while also remaining compliant with applicable laws and regulations, such as the CAA and corresponding regulations.

30.     As a work-around for this failure, Defendants installed defeat devices in the Affected Vehicles. Specifically, Defendants "manufactured and installed software in the electronic control module (ECM) of [the Affected Vehicles] that sensed when the vehicle was being tested for compliance with EPA emission standards." (*See* fn.1 at 3.) When the vehicle was being tested, "the vehicle's ECM ran software which produced compliant emissions results." (*Id.* at 4).

31.     However, during "normal vehicle operation," the Affected Vehicles "ran a separate 'road calibration' which reduced the effectiveness of the emission control system .... As a result, emissions of NOx increased by a factor of 10 to 40 times above EPA compliant levels, depending on the type of drive cycle." (*Id.*).

32.     According to the EPA's NOV, due to the existence of these defeat devices, the Affected Vehicles "do not conform in all material respects to the vehicle specifications described in the applications for the certificates of conformity that purportedly cover them." (*See* fn.1). Thus, Defendants violated federal law by "selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing these vehicles, or for causing any of the foregoing acts." (*Id.*).

33.     In May 2014, after publication of a study commissioned by the International Council on Clean Transportation which found significantly higher in use emissions, the EPA and the California Air Resources Board ("CARB") launched an investigation into the increased emissions.

34.     Throughout the course of this investigation, Defendants continued to deny installing defeat devices in the Affected Vehicles. Rather than admitting to wrongdoing, Defendants lied to government officials with the EPA and CARB, stating that the higher

emissions "could be attributed to various technical issues and unexpected in-use conditions." (*See* fn.1 at 4).

35.     However, when the EPA and CARB made clear that they would not approve COCs for Defendants' 2016 model year vehicles without receiving an adequate explanation for the problems with the Affected Vehicles, Defendants admitted that they had designed and installed the defeat devices.

36.     Up until this 2015 admission of wrongdoing, despite numerous communications with the EPA and filing numerous COCs, Defendants never disclosed the existence of the defeat devices in the Affected Vehicles.

37.     According to the EPA, Defendants "knew or should have known that its [defeat devices] bypass, defeat, or render inoperative elements of the vehicle design relative to compliance with the CAA emissions standards." (*See* fn.1 at 4).

38.     Defendants have recently admitted to the fraudulent scheme described herein through the press.  For example, Volkswagen's Chief Executive Officer, Martin Winterkorn, who resigned on September 24, 2015 amid the scandal allegations, released a statement that he was "personally and deep sorry that we have broken the trust of our customers and the public" and that Volkswagen was launching an investigation into the issue.[8]  Defendants further admitted to "irregularities that have been found in our Group's diesel engines"[9] and that "[a] noticeable deviation between bench test results and actual road use was established" for the Affected

---

[8] VOLKSWAGEN PRESS RELEASE -SEPTEMBER 20, 2015, https://www.volkswagen-media-services.com/en/detailpage/-/detail/Statement-of-Prof-Dr-Martin-Winterkorn-CEO-of-Volkswagen-AG/view/ 2709406/7a5bbec13158edd433c6630f 5ac445da?p_p_auth=gxe7XIHK (last visited Sept. 22, 2015).
[9] VOLKSWAGEN PRESS RELEASE -SEPTEMBER 22, 2015, https://www.volkswagen-media-services.com/en/detailpage/-/detail/Text-video-statement-of-the-CEO-ofVolkswagen-AG/view/2718956/7a5bbec13158edd433c6630f5ac445da?p_p_auth=gxe7XIHK (last visited Sept. 22, 2015).

Vehicles.[10]

39.     By way of further example, the President and CEO of Volkswagen Group of America, Inc., Mr. Michael Horn, was recently quoted by one news outlet as stating the following: "Let's be clear about this. Our company was dishonest. With the EPA, and the California Air Resources Board, and with all of you. And in my German words, we have totally screwed up."[11]

40.     Defendants have since ceased all United States sales of vehicles with the 2.0 liter "Clean Diesel" engines and are in the process of removing those vehicles from dealerships.

### D.  Plaintiff's Purchase of an Affected Vehicle and the Ensuing Harm

41.     Plaintiff purchased an Affected Vehicle in reliance on Defendants' promises, described in part above, that the Affected Vehicles would be fuel efficient, maintain high performance levels, be environmentally friendly, and be compliant with all applicable federal and state laws and regulations.

42.     Specifically, Plaintiff purchased a new 2015 Jetta TDI. Plaintiff purchased it for driving back and forth to work, and he was attracted by VW's representations as to the superior performance and efficiency of its vehicle.

43.     If Plaintiff had known the VW had a hidden defect falsifying emissions performance, he would have bought a different vehicle and not the VW.

44.     Plaintiff not only relied on the foregoing representations in purchasing an Affected Vehicle, but also relied on those representations in paying a significant premium for the Affected Vehicle over gas powered counterparts.

---

[10] Volkswagen Press Release -September 22, 2015, https://www.volkswagen-media-services.com/en/detailpage/ -/detail/V olkswagen-AG-has-issued-the-followinginformation/view/2715181/7a5bbec13158edd433c6630f5ac445da?p_p_auth=gxe7XIHK (last visited Sept. 22, 2015).

[11] ROANOKE TIMES, *VW CEO: 'I am endlessly sorry' brand is tarnished,* http://www.roanoke.com/news/wire_ headlines/vw-ceo-i-am-endlessly-sorry-brand-is-tarnished/article_ 2fbb72b1-fcd5-5e25-93fd-f919dc11deed.html (last visited Sept. 22, 2015).

45.     If Defendants had disclosed that Plaintiff's vehicle had illegally been certified and that it actually emitted upwards of 40 times the permitted levels of NOx, Plaintiff would not have purchased the Affected Vehicle.

46.     Because Defendants' promises, including the promises regarding compliance with applicable laws and regulations and environmental friendliness were false, deceptive, and untrue, the value of the Affected Vehicles has been greatly reduced, if not eviscerated completely.

47.     In addition, the Plaintiff has sustained additional injury and damage.  The vehicle cannot perform with the fuel efficiency, torque and other performance parameters represented by the Defendants, without violated the emissions standards.  To render the vehicle compliant will be costly and on information and belief will result in performance reduction.

48.     As evidence of this reduction in value, Defendants are in the process of removing all unsold vehicles containing the affected 2.0 liter "Clean Diesel" engines from car lots, and Defendants are no longer offering those cars for sale.

49.     Additionally, even if Defendants undertook to alter the Affected Vehicle's engines to meet the required emissions standards, it is likely that the vehicles fuel economy, performance, and overall longevity would be dramatically reduced.

50.     Consequently, Plaintiff and other buyers are left with Affected Vehicles that are currently unsellable, and, in a best case scenario, will be worth significantly less than previously believed following the time and expense of seeking and obtaining repair from Defendants.  In addition the Plaintiff has incurred other injuries and damages.

## V.   TOLLING AND ESTOPPEL

51.     As described herein, Defendants' fraud went undetected by anyone, including state and federal regulators for approximately five years after Defendants began to market the

Affected Vehicles.

52.     It was not until May 2014 when university scientists, after performing extensive laboratory and on-road testing, discovered unusually high on-road emissions created by the Affected Vehicles, that Defendants' fraud was detected.

53.     Moreover, even after state and federal regulators confronted Defendants with the data reflecting unusually high emissions created by the Affected Vehicles, Defendants denied having installed the defeat devices and the widespread nature of the problem. Defendants instead lied to these regulators and characterized the issues as isolated technical malfunctions.

54.     As a result of Defendants' behavior, Plaintiff had no ability to discover the facts supporting the allegations contained herein. This inability to discover the problems with the Affected Vehicles was due exclusively to the fraudulent concealment of the facts by Defendants.

55.     As a result of the foregoing, any applicable statutes of limitation have been tolled and/or Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VI.   CLAIMS FOR RELIEF

### Count I – Fraud by Concealment

56.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

57.     Defendants, through the use of online, television, and print media, as well as direct oral representations through their agents, made multiple false representations to Plaintiff during the pertinent times, and/or intentionally omitted to disclose the Plaintiff relevant and material information regarding the motor vehicle at issue. Specifically, Defendants represented that the Affected Vehicle met all EPA environmental regulations; that it did not contain

equipment deliberately intended to flout the law such as a "defeat device" specifically designed to defeat emission testing programs; that it was environmentally friendly; that it was compliant with all applicable laws and regulations; that it was capable of maintaining excellent fuel economy and high performance levels while remaining environmentally friendly; that it was sold by Defendants as environmentally conscious companies that complied with applicable laws and regulations; and/or that it would perform to the represented parameters without violating the law.

58.     Throughout the time period in which Defendants made the above representations, Defendants knew that they were false and that the Affected Vehicles in fact emitted up to 40 times the amount of NOx allowed by applicable laws and regulations.  Defendants knew that their representations were false and/or recklessly disregarded the truth or falsity of the representations when made.

59.     The knowledge of the falsity of these representations was exclusive to Defendants throughout the time period in which they were made.

60.     Even as late as 2014, Defendants repeatedly lied to the EPA about the existence of defeat devices while nonetheless continuing to market the Affected Vehicles.

61.     Moreover, Defendants went to great lengths to conceal the fact that the above representations were false by installing defeat devices on the Affected Vehicles which masked the amount of the vehicle's emissions during emissions testing, but allowed for the significant, non-compliant emissions during on-road use. These defeat devices were installed on approximately 500,000 vehicles sold in the United States and approximately 11 million vehicles worldwide.

62.     Now, in September 2015, Defendants' executives admit that they were dishonest to Plaintiff and other buyers about the defeat devices Defendants' installed in the Affected

Vehicles.

63.     Plaintiff and other buyers justifiably believed and relied on the above representations in purchasing the Affected Vehicles and in paying a significant premium for the Affected Vehicles over the comparable gas power models.

64.     Plaintiff was injured as a result of the Defendants false and/or reckless misrepresentations.

65.     As a result of the fraud and reliance, Plaintiff and the other buyers have been damaged through the lost value of the Affected Vehicles and has otherwise been injured and damaged in an amount to be proven at trial.

## Count II – Unjust Enrichment

66.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

67.     As a result of the fraudulent scheme described herein, Defendants sold over 11 million vehicles with defeat devices, approximately 500,000 of which were in the United States, including Plaintiff's vehicle.

68.     Defendants received substantial revenues and made substantial profit from the sale of the Affected Vehicles, including Plaintiff's vehicle. This profit also included the premium which Plaintiff and other buyers paid to have "Clean Diesel" engines in their cars, as opposed to similar gas powered models.

69.     Defendants were aware of the immense value being bestowed on them by their fraudulent and illegal conduct, but did nothing to stop this conduct or the flow of money they received.

70.     Defendants' fraudulent and illegal conduct was specifically designed to bring about this flow of money.

71.     Defendants have made no payment or remuneration of the profit it wrongfully received by virtue of its fraudulent conduct.

### Count III – Breach of Implied Warranty of Merchantability
### (Oklahoma Commercial Code, 12A O.S. §§ 2-314, 2-318)

72.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

73.     Defendants are merchants with respect to the goods which they sold to Plaintiff and the other buyers. Specifically, Defendants are merchants of light-duty passenger vehicles.

74.     The goods which Defendants provided to Plaintiff and other buyers were unmerchantable. Specifically, the Affected Vehicles were not compliant with applicable laws and regulations and therefore could not be sold in the United States or the state of Oklahoma.

75.     Volkswagen expressly and impliedly warranted that the Affected Vehicles complied with Federal emission standards, which was false at the time that the vehicle was sold to Plaintiff.

76.     A warranty that the Affected Vehicles were in merchantable condition was implied by law in the instant transaction pursuant to the Oklahoma Commercial Code, 12A O.S. §2-314.

77.     On information and belief, Defendants expressly warranted to the Plaintiff and represented in the Warranty Manual provided with the vehicle that the vehicle "was designed, built and equipped so as to conform at the time of sale with all applicable regulations of the United States Environmental Protection Agency (EPA)."

78.     Defendants' failure to deliver vehicles to Plaintiff that complied with Federal emission standards at the time of sale breached Defendants' express warranty and the implied warranty of merchantability.

79.     Defendants' failure to provide vehicles that were compliant with applicable laws and regulations was a breach of the implied warranty of merchantability, and Plaintiff and other buyers were damaged by the breach in the amount of the diminished value of the Affected Vehicles as well as in the form of other injuries and damages.

80.     As a direct and proximate result of Defendants' breach of express and implied warranties, Plaintiff has been damaged in an amount to be proven at trial.

### Count IV – Breach of Contract (Duty of Good Faith & Fair Dealing)

81.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

82.     The installation of the "defeat device" was not authorized under the terms of Plaintiff's contract with Defendants.

83.     Defendants breached the contract by, among other things, installing the "defeat device," which constituted a breach of the obligation of good faith and fair dealing implied as a term of Plaintiffs' contract with Defendant.

84.     Plaintiff has been injured as a result of the Defendants' breach of contract in an amount to be proven at trial.

### Count V – Fraudulent/Reckless Misrepresentation

85.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

86.     Defendants misrepresented that Plaintiff's vehicle met all EPA environmental regulations and did not contain a "defeat device" specifically designed to defeat emission testing programs.

87.     Defendants knew that its representation was false and/or recklessly disregarded that truth of the representation.

88.     Plaintiff was injured as a result of the Defendants false and/or reckless misrepresentations in an amount to be proven at trial.

## Count VI – Negligent Misrepresentation

89.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

90.     Defendants represented to Plaintiff that the vehicle met all EPA environmental regulations and did not contain a "defeat device" specifically designed to defeat emission testing programs.

91.     Defendants lacked reasonable grounds for believing the truth of this representation because Defendants knew or should have known that it created a vehicle that it marketed as able to meet all EPA emissions standards when in fact it did not.

92.     Plaintiff justifiably relied on the material representation made by the Defendants regarding the car purchased by Plaintiff.

93.     Plaintiff was injured as a result of Defendants' negligent misrepresentation in an amount to be proven at trial.

## Count VII – Statutory Deceit (76 O.S. § 3)

94.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

95.     Based on Defendants' conduct as set forth above, Defendants have engaged in fraud and deceit, as set forth in 76 O.S. § 3, in that Defendants represented that the Affected Vehicles were in compliance with federal and state emissions standards and possessed certain performance and fuel economy characteristics when, in fact, Defendants knew or should have known that the Affected Vehicles were incapable of complying with federal and state emissions standards and, if brought into compliance with such standards, would not possess the performance and fuel economy characteristics advertised.

96.     Plaintiff has reasonably relied on the material misrepresentations and omissions made by Defendants and have been damaged thereby.

97.     Defendants are liable for all damages suffered by Plaintiff as a result of Defendants' deceit.

### Count VIII – Punitive Damages

98.     Plaintiff incorporates by reference the above-alleged paragraphs of the Complaint as if fully set forth herein.

99.     On information and belief, during the pertinent times Defendants deliberately marketed the Affected Vehicles as having emission and performance characteristics that were false and installed technology meant to create fraudulent emissions results.

100.    Defendants intentionally and fraudulently concealed the true emission characteristics of the vehicles and knew that the actual emissions and performance of the vehicles was different than as represented.

101.    The acts of the Defendants as hereinabove set forth were intentional and willful and done with willful disregard of the justifiable expectations and reliance of Plaintiff and others similarly situated.

102.     Defendants' conduct was willful, wanton, malicious, and in reckless disregard for the rights and interests of the Plaintiff.

103.     The conduct of Defendants, as referenced above, justifies an award of punitive damages.  Defendants are properly liable for punitive damages in this action in that Defendants are liable for compensatory damages and have committed one or more aggravating factors justifying an award of punitive damages, including without limitation, acts of egregious, reckless, willful and wanton conduct.

104.     As a direct and proximate result of its acts and omissions herein, Defendants are liable for punitive damages in excess of $75,000.

### **Prayer for Relief**

Wherefore, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

a.   Actual damages, including treble and/or punitive damages where allowable, in an amount in excess of $75,000 exclusive of interest and costs;

b.   Costs of suit and attorneys' fees to the extent allowable by law;

c.   Pre- and post-judgment interest on any damages awarded;

d.   All other remedies authorized by each of the other counts alleged above; and

e.   Such other or further relief as may be appropriate

Plaintiffs hereby demand a trial by jury.

This the 13th day of October, 2015

Respectfully submitted,

**FELIX STEGEN**

By:   *s/ Ryan L. Thompson*
Ryan L. Thompson
WATTS GUERRA LLP
Oklahoma Bar No. 30324
 5726 W. Hausman Rd., Ste. 119
San Antonio, Texas 78249
Office: 210.448.0500
Fax: 210.448.0501
rlt-bulk@wattsguerra.com

Gerald J. Diaz, Jr. (MS Bar No. 6063)
James R. Segars, III (MS Bar No.103605)
THE DIAZ LAW FIRM, PLLC
208 Waterford Square, Suite 300
Madison, MS  39110
(601) 607-3456 Telephone
(601) 607-3393 Facsimile
Email: joey@diazlawfirm.com
Email: tripp@diazlawfirm.com
*Pro hac vice motions to be filed*

**ATTORNEYS FOR PLAINTIFF**